IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROSA M. RODRIGUEZ,                    )
                                      )
          Plaintiff,                  )
                                      )     Case No. 09 C 1810
     v.                               )
                                      )     Magistrate Judge Nan R. Nolan
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Rosa Rodriguez claims that she is disabled due to a combination of physical and mental impairments. She seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons explained below, this case is remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Ms. Rodriguez applied for DIB and SSI on August 23, 2005, alleging that she became disabled on October 1, 2004 due to disc herniation and dislocation, asthma, arthritis, stomach ulcer, panic attacks and depression. (R. 131, 139-42). The application was denied initially on November 1, 2005, and upon reconsideration on April 19, 2006. (R. 89-91). Ms. Rodriguez appealed the Commissioner's decision and requested a hearing before an Administrative Law Judge ("ALJ"). (R. 92). At the June 27, 2007 hearing, Ms. Rodriguez appeared without counsel, prompting the ALJ to advise her of the benefits of representation. (R. 553-55.) Ms. Rodriguez stated that she wished to proceed on her own, and the ALJ conducted a full hearing. (R. 551-601). Nearly eight months

later on February 21, 2008, Ms. Rodriguez appeared for a supplemental hearing, this time with an attorney. (R. 602-35). She amended her alleged disability onset date to January 1, 2006, and provided some additional testimony. (R. 604).

On July 21, 2008, the ALJ denied Ms. Rodriguez's claims for benefits, finding that her multiple severe impairments do not preclude her from performing light jobs that exist in sufficient numbers in the national economy. (R. 17-28). The Appeals Council denied Ms. Rodriguez's request for review on February 26, 2009, and she now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *See* 20 C.F.R § 416.1481.

<u>**FACTUAL BACKGROUND**</u>

Ms. Rodriguez was born on March 5, 1966, making her 39 years old on her alleged disability onset date. (R. 27). She has an associate's degree and worked most recently as a salesperson for Aronson Furniture. (R. 560, 562).

**A.    Medical Evidence**

**1.    2004 - 2005**

The first medical report in the record is an April 19, 2004 Comprehensive Psychological Assessment performed by Maritza Cordero, MA, LCPC, LPHA, of Resurrection Health Care. (R. 249-62). Counselor Cordero described Ms. Rodriguez as angry and depressed, with poor insight and judgment, but she also found her to be neat, alert, and cooperative. Counselor Cordero diagnosed Ms. Rodriguez with major depressive disorder and a cocaine related disorder. (R. 258). An Adult History worksheet from the Resurrection Health Care Family Practice Residency Program dated April 23, 2004 lists diagnoses of major depression/anxiety, irritable bowel syndrome, gastroesophageal reflux disease ("GERD"), mild intermittent asthma, and arthritis. (R. 267-69).

Ms. Rodriguez still exhibited a depressed mood and tearful affect when she saw Counselor Cordero again on April 30, 2004. (R. 263). A progress note dated one week later on May 7, 2004, similarly indicated that Ms. Rodriguez was feeling depressed but showed "no acute distress." (R.

270).  She reported taking her medications irregularly at that time, explaining that she was not able to pay for them.  (*Id*.)  At a September 2, 2004 follow-up visit to Resurrection Health Care, Ms. Rodriguez presented with a throbbing headache lasting three weeks.  (R. 271).  A few months later, on December 19, 2004, she complained of joint pain in her elbows, knees and wrists, and the doctor diagnosed arthritis and peptic ulcer disease/GERD.  (R. 272).  By January 20, 2005, Ms. Rodriguez showed "much improvement" on gastrointestinal symptoms and joint pain, but no improvement on right elbow and right shoulder pain.  (R. 274).  On February 16, 2005, she was treated for asthma exacerbation.  (R. 275).

Counselor Cordero examined Ms. Rodriguez on February 9 and 28, 2005, and reiterated her previous diagnoses of major depressive disorder and cocaine abuse.  (R. 264-65).  At a subsequent visit on April 21, 2005, Counselor Cordero found Ms. Rodriguez to be more depressed than during her previous appointments, with increased cocaine use.  (R. 266).  As for Ms. Rodriguez's physical symptoms, she presented with lightheadedness during a checkup on May 25, 2005, but the condition had abated by June 2, 2005.  She newly reported a gradual onset of right lower back pain at that time.  (R. 278-79).  Ms. Rodriguez missed her next four scheduled appointments at Resurrection Health Care, but when she returned on August 2, 2005, she reported no improvement in her lower back pain.  She also stated that she was experiencing problems with urinary incontinence.  (R. 281).  The doctor ordered an MRI of her lower back, which revealed "disc dessication and end plate degenerative change" at the L5-S1 level; "disc bulging and degenerative spurring with a superimposed central disc herniation"; and "bilateral facet degenerative change." (R. 282, 299).

Towards the end of August, Ms. Rodriguez fell and fractured her wrist.  She went to Resurrection Health Care for follow-up care on September 1, 2005, and was diagnosed with a left scaphoid tear.  (R. 300).  On October 4, 2005, Esther R. Castro, an occupational therapist, found Ms. Rodriguez to have decreased functional capacity secondary to pain, and decreased range of

motion and strength.  (R. 306).  Ms. Rodriguez had an occupational therapy session with Ms. Castro on October 14, 2005, but she then missed two sessions in a row without prior notification. (R. 317-18).

On October 15, 2005, Jeffrey J. Ryan, M.D., performed an Internal Medicine Consultative Examination of Ms. Rodriguez for the Bureau of Disability Determination Services ("DDS").  (R. 319-22).  Ms. Rodriguez told Dr. Ryan that her chief complaint was back pain, which had gotten progressively worse to the point where she found it extremely difficult to bend, and needed assistance putting on her socks and shoes.  Ms. Rodriguez stated that she could only walk about a block before having to stop due to pain, and that she could not sit for more than an hour at a time. (R. 319).  She told Dr. Ryan that she had not received any benefit from extensive physical therapy, and she complained of incontinence, asthma, peptic ulcer disease, and pain in various joints.  (R. 319-20).

Dr. Ryan measured Ms. Rodriguez as 60 inches tall with a weight of 181.5 pounds.  He found her to be well developed, well nourished, very pleasant and cooperative, but also in obvious discomfort with great difficulty maneuvering in the examination room.  (R. 320).  Dr. Ryan observed that Ms. Rodriguez's gait was very antalgic, and opined that she was unlikely to be able to walk more than 50 feet unassisted.  (R. 321).  Ms. Rodriguez exhibited a limited range of motion in her shoulders and spine; a positive straight leg raise sign; diffuse and severe paravertebral muscle spasms; diminished strength in both lower extremities secondary to pain; and paresthesias of the right side.  Dr. Ryan concluded that Ms. Rodriguez had severe radicular back pain, asthma requiring three emergency room visits per year, and peptic ulcer disease.  (*Id*.)

Also on October 15, 2005, Angeles Rodriguez Gonzalez, M.D., conducted a Psychiatric Evaluation of Ms. Rodriguez for DDS.  (R. 326-30).  Ms. Rodriguez's girlfriend drove her to the appointment, and Dr. Gonzalez observed that she was "very good in assisting the claimant to sit and stand up." (R. 326).  Dr. Gonzalez described Ms. Rodriguez as cooperative with good hygiene,

but noted that her gait was very slow. Ms. Rodriguez reported that she had been dealing with depression and panic attacks since she was nine years old, and she complained of poor concentration, intrusive sleep and diminished appetite. (R. 326-27). Ms. Rodriguez said that she "[did] not care about anything or anybody," and Dr. Gonzalez noted that she had tried to kill herself on several occasions, as recently as two weeks prior to his examination. Ms. Rodriguez also reported past clear auditory hallucinations and current visual hallucinations of a man who lived in her room but never talked to her. (R. 327). Regarding substance abuse, Ms. Rodriguez denied any history of drug or alcohol abuse, stating that she last experimented when she was in her teenage years. (*Id*.) Dr. Gonzalez reported that Ms. Rodriguez's mood was depressed and her affect was on the flat side. (R. 328). He found her thought processes to be coherent, logical, and goal-oriented, but he also observed her to be preoccupied with not being able to afford all of her medications. (*Id*.) Dr. Gonzalez opined that Ms. Rodriguez's symptoms had been present for some time and were probably chronic, and he assigned her a Global Assessment of Functioning ("GAF") score of 45 to 50.[1] (R. 329).

On October 26, 2005, Tyrone Hollerauer, Psy.D, performed a Psychiatric Review Technique of Ms. Rodriguez for DDS. (R. 331-44.) Dr. Hollerauer determined that Ms. Rodriguez does not have a severe affective disorder meeting Listing 12.04, or a severe substance addiction disorder meeting Listing 12.09. (R. 331). He indicated that she suffers from bipolar disorder complicated by ongoing cocaine use, and stated that she "mis-reports substance abuse and has little insight on how it [a]ffect[s] her mood." In Dr. Hollerauer's opinion, Ms. Rodriguez's mood is "essentially intact when sober but she is depressed and increasingly so when using." (R. 334, 339). Dr. Hollerauer

---

[1] A GAF score between 41and 50 signifies "serious symptoms (e.g., suicidal ideation…) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th Ed., Text Revision, 2000).

concluded that Ms. Rodriguez is mildly limited in her ability to carry out activities of daily living, and in her ability to maintain social functioning, concentration, persistence, or pace. (R. 341).

Henry S. Bernet, M.D., conducted a Physical Residual Functional Capacity Assessment ("RFC") of Ms. Rodriguez on October 31, 2005. (R. 346-52). Dr. Bernet found that Ms. Rodriguez can occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for at least 2 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and engage in only limited pushing and/or pulling using her upper extremities. (R. 346). Dr. Bernet determined that Ms. Rodriguez experiences pain in her back and decreased range of motion due to bulging discs at L2-L3 and L5-S1, and he observed that her gait is "very antalgic." (R. 352). Dr. Bernet also noted that Ms. Rodriguez suffers from bronchial asthma and depression. (R. 352). DDS Consultant Marion Panepinto confirmed this assessment on March 24, 2006. (R. 376).

### 2. 2006 - 2008

Ms. Rodriguez had an MRI of her left wrist on April 21, 2006, due to persistent pain from the August 2005 fracture. The MRI revealed "[b]one contusion and edema involving the medial distal aspect of the ulna" with some effusion at the "distal radial ulnar joint space." There was evidence of "abnormal signal within the ulnar styloid process which may represent non-union of fracture or avacular necrosis of the fracture segment distally." The MRI further showed a partial tear of the lateral triangular fibrocartilage. (R. 383). An MRI of Ms. Rodriguez's cervical spine taken the same day revealed mild disc bulging at the C4-C5 and the C5-C6 levels, with no focal disc herniation or central canal stenosis. (R. 384).

On May 22, 2006, Ms. Rodriguez started seeing Stephan Romm, Psy.D. She told Dr. Romm that she had been depressed off and on her whole life, but that the symptoms had been getting worse recently. Dr. Romm noted Ms. Rodriguez's long history of psychosocial disruptions, past suicide attempts, and long history of cocaine use. (R. 393). On June 15, 2006, Dr. Romm

reported that Ms. Rodriguez was experiencing confusion, lack of energy or motivation, mood swings, and fatigue. (R. 395).

Ms. Rodriguez had an MRI of her lumbar spine on October 10, 2006. It revealed "disc desiccation and endplate degenerative change" at the L5-S1 level, as well as diffuse disc bulging with mild bilateral neural foraminal stenoses, but no focal disc herniation. (R. 385). A couple months later on December 7, 2006, Ms. Rodriguez returned to Resurrection Health Care complaining of chest pain. (R. 398). A radiology report from December 19, 2006 showed "[m]ild coronary artery disease characterized by fibrous plaque formation in the distal left main and proximal LAD [left anterior descending artery] resulting in mild stenosis of the proximal LAD." (R. 407). Ms. Rodriguez returned to Resurrection Health Care for a follow-up appointment on January 4, 2007. At that time, Ekaterina Kosinskaya, M.D., reported that Ms. Rodriguez's chest pain had abated, but that she still suffered from fibromyalgia, peptic ulcer disease, GERD, asthma, and borderline diabetes mellitus, as well as muscle aches, a depressed mood and obesity. Ms. Rodriguez admitted to using cocaine a few times a year at parties. (R. 399-400).

On February 1, 2007, Ms. Rodriguez met with Dr. Kosinskaya again regarding her borderline diabetes diagnosis. (R. 401). Dr. Kosinskaya noted that at that time, Ms. Rodriguez had constant, chronic back pain, as well as other ongoing disorders such as GERD and depression. She also was refusing to see a mental health professional or to take any antidepressants because she did not like the way they made her feel. (R. 402). On April 5, 2007, Dr. Kosinskaya formally diagnosed Ms. Rodriguez with diabetes mellitus. She also noted that Ms. Rodriguez was complaining of polyuria and nocturia. (R. 403). Dr. Kosinskaya gave Ms. Rodriguez a note confirming that she had been a patient at the Resurrection Health Care clinic since 2004, and that she has been diagnosed with diabetes mellitus II, coronary artery disease, asthma, hyperlipidemia, GERD, depression, and fibromyalgia. (R. 414). Dr. Kosinskaya next saw Ms. Rodriguez on April 18, 2007, when she was admitted through the emergency room complaining chiefly of chest pain. (R. 416).

Ms. Rodriguez underwent cardiac catheterization, but there was no evidence of coronary artery disease, and she was discharged in stable condition. (R. 417).

Approximately one month later, on May 15, 2007, Ms. Rodriguez saw Dr. Romm again for the first time in nearly a year. At that time, Dr. Romm stated that Ms. Rodriguez's situation remained the same despite the extended passage of time. Ms. Rodriguez felt that she had tried everything to help herself, but nothing had worked. (R. 396). The following month on June 14, 2007, however, Ms. Rodriguez had a more positive appointment with Dr. Romm. She reported that she had taken his advice and started walking for 30 minutes per day and lifting weights at the gym, resulting in a loss of 12 pounds. She stated that she felt good about the weight loss. (R. 397).

On July 20, 2007, Dr. Romm filled out a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Ms. Rodriguez. (R. 445-48). Dr. Romm opined that Ms. Rodriguez has moderate restrictions with regard to understanding, remembering and carrying out simple instructions, and in her ability to make judgments on simple work-related decisions, but that she has marked restrictions in her ability to understand, remember and carry out complex instructions, and to make judgments on complex work-related decisions. (R. 445). According to Dr. Romm, Ms. Rodriguez has "attention deficits, abrupt mood shifts, depressive symptoms, chronic pain and is generally impulsive. She often misreads what is wanted of her," and has a poor frustration tolerance, getting angry easily when challenged or stressed. (R. 445-46). Dr. Romm further found that Ms. Rodriguez has marked restrictions in her ability to interact appropriately with the public, supervisors, and co-workers, and in her ability to respond appropriately to usual work situations and to changes in a routine work setting. In reaching this conclusion, Dr. Romm expressly stated that drugs and alcohol "are not significant contributors to th[e] limitations as described." (R. 446).

Dr. Kosinskaya filled out a Physical RFC Questionnaire on Ms. Rodriguez on October 11, 2007. (R. 448-50). She stated that she had seen Ms. Rodriguez at least once a month for ten months, and confirmed diagnoses of diabetes mellitus type II, asthma, GERD, hyperlipidemia,

chronic back pain, fibromyalgia, depression, and insomnia. Dr. Kosinskaya noted symptoms of lower back pain, frequent musculoskeletal pain, frequent urination, and occasional headaches, and opined that Ms. Rodriguez's depression and anxiety both affect her physical conditions. (R. 448). In Dr. Kosinskaya's view, Ms. Rodriguez's pain or other symptoms would be constantly severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (R. 449). In that regard, Ms. Rodriguez could sit for 20-30 minutes at one time before needing to get up, and could stand for 30 minutes before needing to sit down or walk around, resulting in an overall ability to sit and stand/walk for less than 2 hours in an 8-hour workday. (*Id.*) In addition, Ms. Rodriguez would have to take unscheduled breaks from work every 90 minutes for 10-15 minutes per episode. (*Id.*) Dr. Kosinskaya found that Ms. Rodriguez needs to use a cane; can never lift 20 or more pounds; can rarely lift 10 pounds; and can occasionally lift less than 10 pounds. Dr. Kosinskaya concluded that Ms. Rodriguez's impairments are likely to produce "good days" and "bad days," and that she is likely to be absent from work more than four days per month. (R. 450.)

Ms. Rodriguez started seeing José Rodrigo Niño, MA, LCPC, on October 22, 2007, complaining of "eating fingers on hand"; losing her memory; always being sick with arthritis, back pain, diabetes and asthma; and problems gripping items. (R. 464). Ms. Rodriguez told Counselor Niño that she began using cocaine when she was 22, and continued using intermittently until December 2006, when she stopped because of her heart condition. (*Id.*) She described her leisure activities and interests as including swimming, softball, basketball, bicycle riding, and reading Chicken Soup books, but she said that she was no longer riding her bicycle because of pain in her knees and arthritis. (R. 466). Counselor Niño found Ms. Rodriguez to be anxious, irritable, depressed, and angry, and though she did not present with signs of illusions or hallucinations, she did exhibit tangential thought and delusions in the form of talking with stuffed animals. (R. 467). Counselor Niño marked Ms. Rodriguez's suicide risk as minimal, noting that she had made two attempts within the preceding years, but that she denied any current plan or intent to act on such

thoughts. (R. 468). He diagnosed her with depression and borderline personality disorder and assigned her a GAF score of 51. (R. 469). Ms. Rodriguez returned to counselor Niño several times for psychotherapy over the next few months. (R. 470). At her January 1, 2008 appointment, she appeared in a neutral mood, stating that she felt slightly better after being prescribed Zoloft. (*Id*.)

Counselor Niño completed an RFC and Mental Impairment Questionnaire of Ms. Rodriguez on February 8, 2008. (R. 451-54). He based his assessment on the five appointments he had with her over a span of 16 weeks. (R. 451). Counselor Niño confirmed his diagnoses of depression and borderline personality disorder, and once again assigned Ms. Rodriguez a GAF score of 51. (*Id*.) Her symptoms included poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and hostility and irritability. (*Id*.) Counselor Niño identified numerous medications prescribed to Ms. Rodriguez, and stated that they "have many side effects that have implications for working." (R. 452). He opined that her impairments are chronic, requiring long term treatment, and he stated that she would be absent from work more than 3 times a month. (*Id*.)

With respect to Ms. Rodriguez's specific mental ability and aptitude to do unskilled work, Counselor Niño found that she has either a "good" or "fair" ability in all categories. She is not "unlimited/very good" in any category, but neither is she "poor/none." (R. 453). He found that Ms. Rodriguez is moderately restricted in activities of daily living, with marked difficulties in maintaining social functioning. She also has frequent deficiencies of "concentration, persistence, or pace resulting in failure to complete tasks in a timely manner," and would experience repeated episodes of deterioration or decompensation. Counselor Niño confirmed that drug and alcohol abuse are not significant contributors to these symptoms. (R. 454).

10

**B.     Plaintiff's Testimony**

**1.     First Hearing**

At the first hearing before the ALJ on June 27, 2007, Ms. Rodriguez appeared with her partner, Angie Colon, by her side for support, but without counsel. (R. 553). The ALJ described the benefits of representation, but Ms. Rodriguez chose to proceed with the hearing on her own. (R. 555).

Ms. Rodriguez testified that she has not worked since June 2006, and that she was let go from her most recent position as a salesperson at Aronson Furniture because of the company's frustration with her medical conditions. (R. 560-63). When the ALJ asked for all of the reasons she is unable to work, Ms. Rodriguez first mentioned diabetic episodes that she claims cause her to fall unconscious on the floor around three times per week. (R. 563, 570). She also stated that her ulcers cause her to "run to the washroom a lot." (R. 563). Ms. Rodriguez next discussed her arthritis, which negatively affects her ability to grab objects, and the disc problems in her back, which render her unable to sit still. (R. 563-64). In addition, she said that her joints swell up making it hurt too much to go into work, and that her asthma causes her to miss work often during the summer. Ms. Rodriguez testified that her last employer made her wear gloves to work because she bites her hands and fingers due to nervousness and depression, but the gloves really irritate her open wounds. (R. 564).

Ms. Rodriguez identified Dr. Romm as her treating psychologist, and stated that he was seeing her for free because she did not have the money to pay him. (R. 565, 567). The ALJ read aloud from a June 14, 2007 letter, in which Dr. Romm stated that one of the issues he had been working on with Ms. Rodriguez was her frustration over her inability to find work because of her medical conditions. (R. 565-66). Ms. Rodriguez stated that she was just trying to find something that would pay for her bills and medication, explaining that she was supposed to take nine

medications each day, but often could not afford to do so. (R. 566-67). She insisted that her health problems had been bad for two years and were only getting worse. (R. 567).

In discussing her lower back pain, Ms. Rodriguez stated that sometimes she loses her balance while walking; she is unable to run; she cannot lift more than fifteen pounds; and her nerves pinch in her back, causing a lump as big as her fist to grow out of it. (R. 569). She rated her level of pain as 5 or 6 out of 10, stating "[i]t's just a very bad discomfort and it's a throbbing sensation." She also confirmed that she has been to the emergency room a couple of times for her asthma. (R. 571). Regarding her depression, Ms. Rodriguez testified that she had been hospitalized for it "[y]ears ago" and was currently "on depression pills" and seeing a psychiatrist twice a month. (R. 572).

Ms. Rodriguez told the ALJ that Ms. Colon had driven her to the hearing, and that she depends on both Ms. Colon and her daughter to get places. (*Id.*) When asked what she is able to do on the best day of the week, Ms. Rodriguez responded that she can take a 5-10 minute walk to a little strip mall about two blocks from her residence. (R. 573). She is not really able to go on her own, however, because her diabetes makes her suddenly forget where she is going so she has to call her daughter to help her calm down and remember. (R. 573-74).

The ALJ expressed concern about notes in the records before him regarding Ms. Rodriguez's cocaine use, and she acknowledged that she used cocaine in the past when she partied with friends. She also stated, however, that she had gotten really scared when she ended up in the hospital the previous December because of her heart, and that she had not touched the drug since that time. (R. 575). The ALJ then asked Ms. Rodriguez whether she could work if he could make her back pain go away. She replied in the negative, citing her depression, arthritis, and diabetes. At that point, Ms. Rodriguez requested and received a break. (R. 576).

When the hearing resumed, the ALJ asserted that Ms. Rodriguez was "not taking any medication for depression," noting that he did not see any such medication listed in the record. (*Id.*)

Ms. Rodriguez countered that she had been taking Lexapro for depression for about a year. (*Id*.) The ALJ remained skeptical, citing treatment notes from February 1, 2007, which revealed that Ms. Rodriguez had been refusing to take her depression medicine. (R. 577). Ms. Rodriguez acknowledged that she had not taken her medicine for a time, but insisted that she currently was taking the medicine and seeing mental health professionals. (*Id*.) The ALJ pressed further on what he saw as a contradiction in the record, and Ms. Rodriguez stated that for a time she wanted to try to get better on her own, but she now realizes that she cannot do so. (R. 578).

The ALJ next addressed Ms. Rodriguez's "problems with the restroom," noting he had stopped the hearing for approximately 11 minutes while she took her above-mentioned break. (R. 579). Ms. Rodriguez testified that she has an ulcer and needs to visit the restroom three or four times a day because of problems with diarrhea. (R. 580). The ALJ asked Ms. Rodriguez to explain a January 2007 medical chart note showing that she denied having problems with diarrhea, urgency with going to the restroom, or incontinence. (R. 581). Ms. Rodriguez understood that the notes were inconsistent with her testimony at the hearing, but stated, "I know what I go through and I know I take medications for my ulcers." (R. 580-81).

## 2. Second Hearing

Ms. Rodriguez appeared at the supplemental hearing on February 1, 2008, this time with an attorney. (R. 604). The ALJ explained to Ms. Rodriguez that the main reason for the hearing was to receive the testimony of a clinical psychologist, and not as much to question Ms. Rodriguez. (R. 604-05). The ALJ commenced by summarizing the evidence from the prior hearing and the updates provided in the interim. (R. 606-09). He identified asthma, heart disease, lumbar degenerative issues, depression, anxiety, allergies, stomach problems from an ulcer, diabetes, and joint pain as matters to be addressed. (R. 606). He also noted medical records finding Ms. Rodriguez to be impulsive and easily angered, and to have a poor frustration tolerance resulting in rapid mood shifts. (R. 607).

The ALJ next mentioned the fact that Ms. Rodriguez has lost a lot of jobs because of her chronic health issues, and he referenced her difficulties with irritable bowel syndrome, sleep disturbance, confusion/disorientation from her diabetes, chest pain, and shortness of breath with any exertion. The ALJ confirmed that Ms. Rodriguez was still taking prescription medication for her depression, and that she had not used illegal drugs in about a year. (R. 607-08). He also discussed recent documentation indicating that since October 2007, Ms. Rodriguez had been taking classes at Wright College for one to three hours daily. The ALJ noted that she received accommodations from the school's Disability Access Center, including a designated note taker and the ability to take as many breaks as she needed. (R. 607).

After a break in the hearing, Ms. Rodriguez's counsel elicited additional testimony about her condition involving eating her hands. (R. 609, 611-12). Ms. Rodriguez stated that her open sores were one of the biggest problems that caused her to lose her most recent job at Aronson Furniture, as she would "have blood…on a shirt with someone when I was shaking and… really [not] even realize it." (R. 611). As for her classes at Wright College, Ms. Rodriguez explained that she needs help taking notes and has trouble concentrating and remembering what she hears and reads. (R. 612). Ms. Rodriguez described how she "explode[s] sometimes for just no reason" and gets easily frustrated, elaborating on a recent incident where she lost her patience with one of her instructors. (R. 613-14). She testified that she tries not to go anywhere by herself anymore without friends or relatives to escort her. (R. 614).

**C.     Vocational Expert Testimony**

Vocational Expert ("VE") James Breen testified at the first hearing before the ALJ. (R. 583-600). He questioned Ms. Rodriguez regarding the nature of her employment over the prior 15 years, which included positions as a home health aide, retail sales associate, cashier, pawnbroker, security campus driver, pet store manager, garage door company manager, and security guard. (R. 584-91). The ALJ remarked that Ms. Rodriguez appeared to be extremely well organized in

answering the questions, noting that she had a notebook filled with information pertinent to the receipt of benefits. (R. 591). Ms. Rodriguez testified that she has to be organized because her mind "goes sometimes" and she cannot remember things well. (R. 591-92).

The VE classified Ms. Rodriguez's work experience as follows: security guard – semi-skilled, light; home health aide – semi-skilled, medium; pawnbroker – semi-skilled, light; branch manager – skilled, sedentary; and customer service clerk – semi-skilled, light. The ALJ asked the VE to consider whether there are unskilled jobs available at the light and sedentary levels that do not require any public contact or extended written or oral communication. (R. 597). For light occupations, the VE listed mail clerk (6,000 positions); electrical accessories assembler (14,000 positions); and hand packer (40,000 positions). (*Id*.) For sedentary occupations, the VE listed eyeglass assembler (about 2,000 positions); other small product assembly (like toys) (about 6,000 positions); and surveillance system monitor (about 5,000 positions). (*Id*.)

The ALJ asked whether those jobs would still be available to a person who needs to switch positions every 5 to 10 minutes. The VE stated that the jobs would remain available as long as the individual was not off task for more than 10 minutes per hour. (R. 598). If the person needed to take two unscheduled breaks over a two to three hour period, however, she would be unemployable because there is no flexibility concerning unscheduled breaks. (R. 598-99). In addition, all of the jobs need to be done independently, and would not be available where "there's a lot of things the claimant is not able to do on her own." (R. 599). The VE testified that an individual who is unable to remember and carry out simple instructions without reminders would not be able to perform any of the jobs he listed, and he also noted that employers expect no more than one absence from work per month. (R. 598-99). As for how an employer would respond if an individual became disoriented or confused, or actually fell to the floor in the work environment, the VE stated, "[n]ot well at all." (R. 600).

### D.    Medical Expert Testimony

Medical Expert ("ME") Mark I. Oberlander, Ph.D., testified at the supplemental hearing before the ALJ. (R. 616-34). In describing the mental health evidence before him, the ME at times lamented the absence of complete records. (R. 617-20). For example, he had some questions regarding the diagnoses made by Counselor Niño, and stated that "this is why it would have been absolutely critical to have the session notes available to see what these conclusions are based on." (R. 619). The ME noted that a mental RFC for Ms. Rodriguez provided functional limitations in activities relating to work that are "quite serious," but he found them somewhat inconsistent in light of the testimony he heard regarding Ms. Rodriguez's capacity to pursue college studies. (R. 619-20). He also found Counselor Niño's statement that drug abuse does not contribute to Ms. Rodriguez's symptoms to be inconsistent with previous treating material from other sources who found a co-variation between the severity of her psychiatric symptoms and substance use.[2] (R. 620).

The ME described Ms. Rodriguez as moderately limited in her ability to engage in activities of daily living and to maintain adequate social functioning, concentration, persistence or pace, but there was insufficient evidence regarding episodes of decompensation. (R. 621-23). The ME acknowledged that he did not have any reports setting forth Ms. Rodriguez's current activities of daily living, but he stated that her testimony about college courses suggested an ability to provide for herself in that area. (R. 623). Ms. Rodriguez noted, however, that her college courses were not at the college level, and that she had tested at a seventh grade reading level and a sixth grade writing level. (R. 625). These facts did not alter the ME's assessment of Ms. Rodriguez's ability to engage in activities of daily living, but they did raise questions in his mind regarding how she

---

[2]      The ME explained that the co-variation he was referring to was that the "psychiatric symptomatology increases in intensity as the use of drugs increases and vi[c]e versa." (R. 620).

could have completed three years of college course work in the past to receive an associate's degree. (R. 626). The ALJ said that he would think about the fact that Ms. Rodriguez was struggling through her courses and receiving Cs and a D. (R. 625).

With respect to Ms. Rodriguez's moderate restriction in social interaction, the ME emphasized her testimony that she enrolled in school in part because she wanted to socialize and make friends. In the ME's view, "[t]hat kind of statement does not come from a person who is markedly impaired in . . . social functioning." (R. 627). As for Ms. Rodriguez's moderate restriction in concentration, the ME said that he relied on Counselor Niño's assessment that Ms. Rodriguez has a good ability to remember and carry out simple instructions. (R. 628-29).

Ms. Rodriguez's counsel asked the ME why he thought she might have an ongoing substance abuse problem when both Dr. Romm and Counselor Niño indicated that such abuse was not a factor in her limitations. The ME noted that Ms. Rodriguez had tested positive for benzodiazepine use on February 27, 2006, and that there was at least one additional reference to cocaine use on January 4, 2007. (R. 631, 633). The ALJ continued to "puzzl[e] over what the right answer is" and concluded the hearing.

**E.    The ALJ's Decision**

The ALJ followed the familiar five-step sequential process outlined in 20 C.F.R. § 404.1520 in concluding that Ms. Rodriguez has not been under a disability within the meaning of the Act from the alleged disability onset date of January 1, 2006 through the date of his decision on July 21, 2008. (R. 20-28). At the first step, the ALJ determined that Ms. Rodriguez has not engaged in substantial gainful activity since January 1, 2006. (R. 22). At the second step, the ALJ found that Ms. Rodriguez has the following severe impairments: "personality disorder; major depressive disorder; substance abuse; history of left scaphoid tear; history of partial tear of the left lateral triangular fibrocartilage; L5-S1 disc herniation and degenerative disc disease; type II diabetes mellitus; asthma; hyperlipidemia; and gastroesophageal reflux disease." Ms. Rodriguez's coronary

artery disease and fibromyalgia, however, are not severe for purposes of the disability evaluation. (R. 23).

At the third step of the five-step sequential process, the ALJ found that Ms. Rodriguez does not have an impairment or combination of impairments that meets or medically equals any listed impairment in the Social Security regulations. In that regard, the ALJ mentioned the mental impairments set forth in Listing 12.04, 12.08 and 12.09, and adopted the ME's testimony "as reflective of the medical evidence as a whole." The ALJ agreed with the ME that the functional assessments provided by Counselor Niño and Dr. Romm were inconsistent with Ms. Rodriguez's college studies. He also found it suspicious that no treating source other than Counselor Niño and Dr. Romm ever mentioned that Ms. Rodriguez suffers from delusions or hallucinations. Finally, the ALJ noted that Ms. Rodriguez denied abusing drugs or alcohol when asked by both Counselor Niño and Dr. Romm, but that she "obviously has abused substances on an ongoing basis." (R. 23-24).

The ALJ found that Ms. Rodriguez retains the RFC to perform light work, "subject to only occasional bending, squatting, crawling, kneeling and balancing, and work only on level surfaces away from excessive concentrations of dust, fumes, odors and temperature extremes." (R. 24-25). The ALJ further limited Ms. Rodriguez to unskilled work that does not require public contact or extended oral or written communication. (R. 25). In explaining this RFC, the ALJ noted that Ms. Rodriguez had used a cane at both hearings "though there was no indication that it was prescribed by a doctor or that it was medically necessary." He also "observed at the supplemental hearing that she presented in a dramatic fashion as far as physical movements, grunts, sighs and grimaces." (*Id*.) The ALJ found it significant that Ms. Rodriguez had worked for Aronson Furniture for four months after her alleged disability onset date, and that she subsequently had filed for unemployment insurance, "signifying readiness, willingness and ability to work." (*Id*.)

With respect to Dr. Kosinskaya's contrary opinion, the ALJ rejected it as "not supported and entirely dependent upon unreliable history provided by the claimant." (R. 26). In the ALJ's view,

the "objective medical evidence, including the doctor's own clinical findings," did not support her assessments. (*Id.*) The ALJ also found it significant that "[a]s of February 1, 2007, the claimant <u>refused</u> to take any anti-depressants or see a psychologist or psychiatrist." (*Id.*) (emphasis in original). He further emphasized that "when last seen <u>one year before</u>, she continued to indulge cocaine and regarded herself as very organized." (*Id.*) (emphasis in original).

At the final two steps of the analysis, the ALJ found that Ms. Rodriguez is unable to perform any past relevant work, but that she remains capable of performing unskilled jobs that exist in significant numbers in the national economy. (R. 27).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. *See* 42 U.S.C. § 405(g). The court's review is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the ALJ applied the correct legal standards in reaching his decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court's review is deferential, but the court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

### B.    Five-Step Inquiry

To recover SSI and DIB under Titles II and XVI of the Act, a claimant must establish that she has a "disability" within the meaning of the Act. *See* 42 U.S.C. § 1382c(a)(3)(A); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). An individual is disabled if she is unable to

perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905. To determine whether a claimant is disabled under the Act, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of the specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). If the claimant makes it past step four, the burden shifts to the ALJ to demonstrate that claimant can perform a significant number of jobs that exist in the economy. *See Young*, 362 F.3d at 1000.

## C.    Analysis

Ms. Rodriguez argues that the ALJ erred in failing to assess her credibility or to consider whether she meets Listing 1.04 for disorders of the spine. She also objects that the ALJ improperly rejected the opinions of her treating physicians, made an inaccurate RFC determination, and failed to consider her obesity. The court addresses each argument in turn.

### 1.    The ALJ's Credibility Finding

Ms. Rodriguez first argues that the ALJ's decision is not supported by substantial evidence because he failed to make a proper credibility determination as required by SSR 96-7p. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."

*Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529.

After concluding that Ms. Rodriguez suffers from numerous severe impairments, the ALJ recited general language suggesting that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and 416.29 and SSRs 96-4p and 96-7p." (R. 25). Beyond that, however, he merely implied that Ms. Rodriguez was exaggerating her symptoms. The ALJ noted, for example, that she presented at the hearing "in a dramatic fashion as far as physical movements, grunts, sighs and grimaces"; she attends classes at Wright College; she worked for four months from March through June 2006 despite claiming to be disabled during that period; and she applied for unemployment insurance, which signifies "readiness, willingness and ability to work." In addition, Ms. Rodriguez identified her leisure activities to include swimming, softball, basketball, bicycle riding, and reading Chicken Soup books, but she only denied engaging in bicycle riding due to pain in her knees and arthritis. (R. 25-26).

The problem is that an ALJ "must *specify* the reasons for his [credibility] finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (emphasis in original). The Commissioner contends that the ALJ rejected Ms. Rodriguez's subjective allegations "to the extent that they were inconsistent with his [RFC] finding." (Def. Resp., Doc. 26, at 3.) The ALJ made no such determination, however, so the court has no idea how much weight, if any, the ALJ gave to Ms. Rodriguez's testimony. *See Steele*, 290 F.3d at 941 (the court must "confine [its] review to the reasons supplied by the ALJ.") *See also McQuestion v. Astrue*, 629 F. Supp. 2d 887, 896 (E.D. Wis. 2009) (the reasons for a credibility determination "may not be implied or supplied later by the Commissioner's lawyers.")

The ALJ did discuss some of Ms. Rodriguez's statements that do not support a disability finding, such as her refusal to take antidepressants or see a mental health professional in June 2007; her testimony that, also in June 2007, she was walking 30 minutes a day and lifting weights and had lost 12 pounds; and her reported ability to "watch[] her 1 ½ year old granddaughter, at least part time, in May 2006." (R. 26). The ALJ also mentioned testimony that would support a finding of disability, such as Ms. Rodriguez's need for bathroom breaks six times a day for 10 to 20 minutes per episode; her reliance on a note taker and need for the ability to take unscheduled breaks during class; and her difficulties sitting, walking, lifting and concentrating. (R. 25). Yet the ALJ failed to articulate which of these statements he found credible, if any, or to explain how he weighed the factors set forth in SSR 96-7p.

Contrary to the Commissioner's assertion, the mere fact that the ALJ cited SSR 96-7p does not demonstrate that he complied with its requirements. *See Steele*, 290 F.3d at 942 ("Invoking a legal rule does not substitute for complying with the requirements of that rule, and here the ALJ's evaluation of [claimant's] credibility does no more than cite ruling 96-7p without supplying any of the details demanded by that provision.") The court recognizes that hearing officers are in the best position to evaluate a witness's credibility, and that their assessment should be reversed only if "patently wrong." *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Before deferring to an ALJ's credibility assessment, however, the court "must first be certain that a credibility determination has actually been made." *Schroeter v. Sullivan*, 977 F.2d 391, 394-95 (7th Cir. 1992). *See also Spaulding v. Barnhart*, No. 05 C 6311, 2007 WL 1610445, at *6 (N.D. Ill. Mar. 2, 2007). The court "cannot presume that the ALJ disbelieved . . . evidence without any explicit findings to that effect." *Id.* (quoting *Look v. Heckler*, 775 F.2d 192, 195 (7th Cir. 1985)).

Here, there appear to be some inconsistencies between Ms. Rodriguez's complaints and other medical and testimonial evidence, but the ALJ did not discuss how he weighed those

inconsistencies in reaching his decision. Absent an adequate credibility determination, the ALJ's decision is not supported by substantial evidence and must be remanded for further analysis.

### 2. Listing 1.04

Ms. Rodriguez contends that the ALJ also erred in neglecting to mention Listing 1.04 or to analyze evidence suggesting that she meets its requirements. Listing 1.04A covers disorders of the spine, resulting in compromise of a nerve root or the spinal cord, with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.04A. Ms. Rodriguez claims that the August 2005 and October 2006 MRIs of her back reveal the requisite spinal disorder, as both show "disc dessication and end plate degenerative change" at the L5-S1 level; "disc bulging"; and "mild bilateral neural foraminal stenoses." (R. 299, 385, 498). She also notes her documented complaints of right sciatic pain and chronic back pain. (R. 282, 398, 402, 405).

Regarding the additional evidence required for subpart A, Ms. Rodriguez relies on Dr. Ryan's October 2005 assessment that she has a limited range of motion in her shoulders and spine; a positive straight leg raise sign; diffuse and severe paravertebral muscle spasms; diminished strength in both lower extremities secondary to pain; and paresthesias of the right side. (R. 321). Ms. Rodriguez argues that this evidence, in conjunction with her other severe impairments, supports a finding that she is presumptively disabled under Listing 1.04A, and claims that the ALJ should have addressed this in his decision.

The Commissioner disagrees, arguing that the ALJ was not required to discuss a Listing that Ms. Rodriguez does not meet. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("The applicant must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits and supplemental security income under step three.") The Commissioner notes,

for example, that neither Dr. Ryan nor any other medical source found Ms. Rodriguez to have muscle atrophy. The Listing, however, does not require a showing of muscle atrophy, but only motor loss that may be indicated by either muscle atrophy or muscle weakness. *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) ("Inability to squat or to walk on the toes or heels can be evidence of significant motor loss.")

Nevertheless, the ALJ does cite evidence inconsistent with a finding that Ms. Rodriguez has a presumptively disabling spinal disorder. The March 2005 MRI showed "degenerative spurring with a superimposed central disc herniation," but the October 2006 MRI revealed "no focal disc herniation." And though Dr. Ryan documented a positive straight leg raise sign and abnormal gait in October 2005, Dr. Kosinskaya found no sensory or motor deficits in January or February 2007. (R. 26, 400, 401). In addition, there is no clinical evidence of numbness, loss of sensation, nerve root compression, or a compromised spinal cord. *Cf. Ribaudo*, 458 F.3d at 583-84. Ms. Rodriguez "has the burden of showing that h[er] impairments meet a listing," and she has not done so in this case. *Id*. at 583. On these facts, the ALJ's failure to mention Listing 1.04 is not a sufficient basis for remand. *Cf. Rice*, 384 F.3d at 369-70; *Mogg v. Astrue*, 266 Fed. Appx. 470, 471 (7th Cir. 2008) (quoting *Ribaudo*, 458 F.3d at 583) ("[O]ur cases hold that 'an ALJ *should* mention the specific listings he is considering and his failure to do so, *if combined* with a 'perfunctory analysis,' *may* require a remand.") (emphasis in original).

3.      **The Treating Physicians**

Ms. Rodriguez next argues that the ALJ improperly rejected the opinions of her treating family practitioner, Dr. Kosinskaya, and her mental health treaters, Dr. Romm and Counselor Niño. (R. 25-26). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). A claimant is not disabled simply because his treating physician says so. *Dixon v. Massanari*, 270 F.3d 1171, 1177

(7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Id*. (*quoting Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)). If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5).

The ALJ's decision to reject Dr. Kosinskaya's opinion is significant given the Commissioner's concession that, if accepted, her assessment would render Ms. Rodriguez disabled. (Def. Resp., Doc. 26, at 7). The Commissioner argues that the ALJ properly rejected Dr. Kosinskaya's opinion as "not supported and entirely dependent upon unreliable history provided by the claimant." (R. 26). To be sure, "[a]n ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations." *See Dixon*, 270 F.3d at 1178. *See also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (ALJ may discount a treating physician's opinion that is "based solely on the patient's subjective complaints.") As explained earlier, however, where medical evidence establishes an underlying impairment, an ALJ cannot discredit subjective symptoms of that impairment without articulating logical reasons for doing so. *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *16 (N.D. Ill. Sept. 16, 2009). Here, the medical evidence establishes that Ms. Rodriguez suffers from several severe impairments, but the ALJ failed to assess the subjective symptoms of those impairments, or to assign Ms. Rodriguez's statements any specific weight. On this record, Ms. Rodriguez's purported lack of credibility is not an adequate basis for rejecting Dr. Kosinskaya's opinion.

The Commissioner does not mention any other basis for affirming the ALJ's decision, but the court notes that the ALJ found Dr. Kosinskaya's opinion regarding Ms. Rodriguez's back pain,

frequent urination and frequent headaches to be unsupported by "[t]he objective medical evidence, including [her] own clinical findings." (R. 26). The ALJ claimed that Dr. Kosinskaya "recorded no actual clinical findings or test results to document the results of back examination or back treatment," stressing that notwithstanding the MRI results and the opinion from Dr. Ryan, Dr. Kosinskaya found no motor deficits or sensory disturbance in January 2007. (*Id*.) Perhaps, but the ALJ failed to mention that in February 2007, Dr. Kosinskaya found Ms. Rodriguez's back to be tender on palpation, with decreased range of motion, extension and flexion. These findings are arguably consistent with Ms. Rodriguez's continued complaints of back pain in April 2007, which have not been properly discounted. (R. 401, 403).

Dr. Kosinskaya similarly documented Ms. Rodriguez's repeated complaints of incontinence and headaches. (R. 281-82, 399, 403, 419, 448). The ALJ, however, did not explain why he rejected these findings, or how they were inconsistent with the medical records. *See Scott v. Astrue*, No. 08 C 5882, 2010 WL 1640193, at *11 (N.D. Ill. Apr. 22, 2010) ("[t]he ALJ . . . may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision.") The court thus cannot conclude that the ALJ's decision to reject Dr. Kosinskaya's opinion in its entirety is supported by substantial evidence.

Also troubling is the ALJ's outright rejection of the opinions of Dr. Romm and Counselor Niño. The ALJ offered three explanations for this decision: (1) the ME testified that Ms. Rodriguez's studies, though not at a college level, indicate an ability to provide for herself in the functional activities of daily living; (2) both Dr. Romm and Counselor Niño cited "delusions and hallucinations that no other treating source reference[d]"; and (3) Ms. Rodriguez "failed to provide these sources with information which may have colored and influenced appropriate evaluation. That is, she denied ongoing drug and alcohol abuse when they asked, but she obviously has abused substances on an ongoing basis." (R. 24).

The court finds no error in the ALJ's decision to accept the ME's testimony regarding Ms. Rodriguez's studies. Ms. Rodriguez testified that she enrolled in school to make friends and socialize, and she takes classes for one to three hours every day. The ME reasonably found this inconsistent with the more limited functional diagnoses provided by Dr. Romm and Counselor Niño. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.027(f)(2)(1)) ("It is appropriate for an ALJ to rely on the opinions of . . . psychologists who are also experts in social security disability evaluation.") For similar reasons, the ALJ also explained adequately his decision to discount the opinions of Dr. Romm and Counselor Niño with respect to Ms. Rodriguez's delusions and hallucinations. Specifically, he noted that the ME "challenged those findings as unlikely given daily living activities and functioning required to persist with college studies at least four months." (R. 26).

Nevertheless, Counselor Niño and Dr. Romm both provided remarkably consistent descriptions of Ms. Rodriguez's depression, anxiety, low frustration threshold, and problems with concentration. (R. 326-30, 444-47, 451-54). The ALJ failed to explain why he gave no weight whatsoever to any of this evidence. The ALJ did state that Dr. Romm and Counselor Niño lacked pertinent information because Ms. Rodriguez "denied ongoing drug and alcohol abuse when [these treaters] asked." (R. 24). The record shows, however, that Ms. Rodriguez was forthright with both mental health practitioners in that regard. (R. 24). Dr. Romm noted that Ms. Rodriguez "began to drink hard liquor x 1 year"; that she had used cocaine on and off since she was 21; and that although she had been clean for about 4 ½ months, she "doesn't want to stop – just out of [money] for now." (R. 391). Counselor Niño similarly noted that Ms. Rodriguez admitted to using cocaine off and on since she was 22. (R. 464). Despite their knowledge of Ms. Rodriguez's substance abuse, both practitioners found that it was not a significant contributor to her substantial impairments. (R. 446, 454).

The Commissioner claims that the ALJ properly rejected Dr. Romm's opinions regarding Ms. Rodriguez's physical impairments because a psychologist is not competent to render medical opinions. (Def. Resp., Doc. 26, at 8) (citing *Craft v. Bowen*, 812 F.2d 1406 (Table), at *1 (6th Cir. Jan. 17, 1987)) ("Because the psychologist . . . was not medically trained, he was not competent to evaluate the medical significance of the objective findings of an examining medical doctor.") The Commissioner is apparently referring to the ALJ's assertion that Dr. Romm "expressed his opinion that diabetes, chronic back pain and fibromyalgia would make work difficult, but his June 14, 2007 note reflects that for the past year the claimant had been engaged in looking for part-time work." (R. 27). The court is not persuaded.

First, this statement does nothing to explain why the ALJ rejected Dr. Romm's mental health assessment, including that Ms. Rodriguez suffers from depression, abrupt mood shifts, impulsivity and poor frustration tolerance that renders her markedly limited in the ability to understand, remember and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting. (R. 445-46). In addition, the mere fact that Ms. Rodriguez wanted to find a job does not demonstrate that she is capable of full-time employment. *See, e.g., Heldenbrand v. Chater*, 132 F.3d 36 (Table), at *14 (7th Cir. Dec. 15, 1997) ("A claimant might seek a job in ignorance of the nature of his conditions, only to find later, after being hired, that his attempt to work is unsuccessful due to his disabilities; or he might work only an hour or two a day; or receive gratuitous or charitable employment.") Notably, Ms. Rodriguez has a designated note taker to assist her with her classes at Wright College, and she is allowed to take as many breaks as she needs. (R. 607).

The Commissioner attempts to avoid this conclusion by arguing that the ALJ "largely accommodated [Ms.] Rodriguez's mental impairments by limiting her to unskilled work with no extended oral/written communication or public contact." (Def. Resp., Doc. 26, at 8). It is not clear,

however, that these restrictions accommodate all of the mental impairments discussed by Dr. Romm, and there is nothing in the record to suggest they do. The ALJ's outright rejection of the opinions of Dr. Romm and Counselor Niño is not supported by substantial evidence and must be reviewed on remand.

### 4.     The ALJ's RFC Assessment

Ms. Rodriguez next objects that the ALJ improperly failed to account for all of her limitations in setting her RFC. "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). *See also* SSR 96-8p ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.")

Ms. Rodriguez asserts that despite being presented with a great deal of information regarding her problems with irritable bowel syndrome and frequent urination, the ALJ failed to provide any limitation for these conditions in his RFC. *See Golembiewski*, 322 F.3d at 917 ("Incontinence constitutes an impairment under the Social Security Act that must be considered to determine whether an applicant is disabled.") Dr. Kosinskaya opined, for example, that Ms. Rodriguez would require unscheduled breaks every 90 minutes for 10 to 15 minutes each time. (R. 449). The VE testified, moreover, that someone who needs to take two unscheduled breaks over a two to three hour period is unemployable; that employers have no flexibility with regard to unscheduled breaks; and that an employee needs to be on task at least 50 minutes per hour. (R. 598-99).

The Commissioner believes that he rebutted this urinary frequency argument but, in fact, he did not. (*See* Def. Resp., Doc. 26, at 8). As noted, Dr. Kosinskaya documented Ms. Rodriguez's repeated complaints of incontinence, and the ALJ failed to explain adequately why he

dismissed that evidence.  (R. 281-82, 399, 403, 419, 448).  Nor did he properly address Ms. Rodriguez's credibility in that regard.  On these facts, the court cannot say that the ALJ's decision not to include urinary frequency in the RFC is supported by substantial evidence.

The ALJ's RFC is also flawed in that it does not properly account for Ms. Rodriguez's moderate limitations in concentration, persistence, or pace.  The Commissioner acknowledges that ALJs cannot account for such moderate limitations by restricting a claimant to simple, routine tasks.  *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009).  But the ALJ here did just that, stating that "the work should be unskilled and not require public contact or extended oral/written communication." (R. 25).  The Seventh Circuit has consistently found this to be inadequate.  *Stewart*, 561 F.3d at 684-85 (RFC limiting the claimant to "simple, routine tasks that do not require constant interactions with coworkers or the general public" did not account for moderate limitations in concentration, persistence, or pace); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008) (RFC for unskilled work did not provide any information about the claimant's mental condition or abilities).

### 5. Obesity

Ms. Rodriguez finally objects that the ALJ failed to consider her obesity in combination with her other impairments.  "[U]nder S.S.R. 02-1p the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Villano*, 556 F.3d at 562.  Here, Ms. Rodriguez is 5'0"; she weighed between 180 and 187 pounds at her medical examinations; and Dr. Kosinskaya specifically mentioned obesity in one of her treatment notes.  (R. 274, 400).  The ALJ did not address these facts, but the Commissioner argues that any error in that regard is harmless.  In the Commissioner's view, Ms. Rodriguez "did not articulate how her obesity exacerbated her underlying conditions and further limited her functioning – as it was her burden to do."  (Def. Resp., Doc. 26, at 10) (quoting *Hernandez v. Astrue*, 277 Fed. Appx. 617, 624 (7th Cir. 2008).)

30

The Commissioner is correct that Ms. Rodriguez did not expressly articulate that her obesity exacerbates her impairments, but she did complain of back pain, fibromyalgia, problems sitting still, loss of balance, and difficulty walking, all of which could be impacted by obesity. On remand, the ALJ should consider whether Ms. Rodriguez's obesity has any affect on her limitations or should factor into a disability finding.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 20] is granted in part and denied in part, and Defendant's Cross-Motion for Summary Judgment [Doc. 25] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: May 26, 2010

_____
NAN R. NOLAN
United States Magistrate Judge